**BOWLING GREEN MANUFACTURING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18491.

United States Court of Appeals
Sixth Circuit.
Sept. 26, 1969.

James H. Lucas, Bowling Green, Ky., for petitioner; Harlin, Parker, Ricketts, Lucas & English, Bowling Green, Ky., on brief.

William J. Avrutis, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul J. Spielberg, Atty., N.L.R.B., Washington, D. C., on brief.

Before WEICK, Chief Judge, EDWARDS, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

The Bowling Green Manufacturing Company filed a petition to review the decision of the National Labor Relations Board, which found that the company was guilty of an unfair labor practice in violating Section 8(a) (1) of the National Labor Relations Act because of its discharge of an employee, Constance J. Montgomery, on the ground that she had made defamatory statements about the company in a radio broadcast during a union campaign for recognition as a bargaining agent for the employees. The Board found that respondent company had discharged Mrs. Montgomery because she engaged in concerted activity for the purpose of collective bargaining, or other mutual aid and protection on behalf of the employees of the respondent.

The company contends that the discharge of employee Montgomery was not an unfair labor practice but was based solely upon her violation of its rule against employees making false or vicious, or malicious statements about the company.

In the radio broadcast in question, employee Montgomery made the following statements in an interview, on Station WBGN of Bowling Green, Kentucky, with Mr. Clark Conway, a Union representative:

"Hello, this is Clark Conway, speaking in behalf of the IAM. With me in the studio today is Jane Montgomery, an employee of Holley Carburetor for the past 13 years, and presently employed in the Burr Department. Jane, first of all, let me ask you just why, and in your opinion, why are the majority of Holley Carburetor employees seeking IAM union representation?

"That's a difficult question to answer, Clark, for with so many people involved, naturally a variety of reasons apply. However, speaking for myself and for a number of others to whom I have talked, one reason seems to emerge more often than others. This is the unfair treatment a great many people have received when they became injured or sick. For instance, just recently one employee who had been with the Company for years became unable to continue on her assigned job because the chemicals in which she had to work affected her hands so badly she was finally sent to the Company physician who told her not to continue working in them. Supervision and Personnel insisted that she do so and when she refused to on advice of this doctor, they sent her home saying that she voluntarily quit. Now they have even stopped her from drawing unemployment insurance.

"Naturally, we all want union wages and working conditions in our shop, but I think on the whole the most important thing to all of us is a good union grievance procedure which will protect us from treatment such as

this. It is this, I think which will be uppermost in the minds of Holley workers when they step behind that curtain on election day and mark their ballots for the IAM."

The day following the broadcast, employee Montgomery was called to the office of the company by Mr. E. J. Jones, Director of Industrial Relations for the Bowling Green Manufacturing Company and, at that time, Mr. Jones informed Mrs. Montgomery that, in the broadcast, she had slandered the company, and that if a retraction of her statements in the broadcast was not made within forty-eight hours, she would be discharged. On the same day, Mr. Jones prepared a memorandum to all employees, which was posted on the company's bulletin board, explaining that the broadcast in question contained false and malicious statements in connection with the resignation of one Juanita Beach, and that Mrs. Montgomery had been allowed forty-eight hours to retract publicly her false and malicious statements about the situation, or be discharged. Mrs. Montgomery refused to retract her statements and was again called to the office of Mr. Jones, where she signed her separation papers, which bore the statement: "Discharge—Publicly making false and libelous statements about the company and some of its employees during a radio broadcast on February 15, 1967."

Mr. Jones testified that the former employee, Mrs. Beach, who was the subject of Mrs. Montgomery's radio broadcast, was never discharged, but had quit her job under the following circumstances: Because of a recurring dermatitis condition, she was to be transferred to a department where it would not be necessary for her to handle articles which had been dipped in chemicals that irritated her skin. However, when she learned that in the new position to which she was being assigned, she was to work under Foreman Lewis, she went to the personnel office, which was in charge of Mr. E. J. Jones, quit

her job, and threw her badge violently on the desk of the secretary. Mr. Jones also testified that he knew Mrs. Montgomery's statements concerning the company and Mrs. Beach were false, because he personally handled the termination of Mrs. Beach's employment. He further testified that Mrs. Beach later called him by telephone and stated that everything she had told Mrs. Montgomery and everything she had said about the company was false; and that the union had put her up to it, so that Mrs. Montgomery could make her radio broadcast.

On this point Mr. Jones testified in detail as follows:

"A. I handled the Beach case personally.

Q. Would you describe to the Board the facts that took place there?

MR. WOODCOCK: I object to any testimony concerning the discharge of Mrs. Beach because Mrs. Beach's termination is not in issue in this case.

TRIAL EXAMINER: Overruled.

MR. LUCAS: Go ahead.

THE WITNESS: Well, on or about the 17th of January, I am not too sure of the date, the nurse informed me that Mrs. Beach,, was having trouble with her hands and that she was sending her to the doctor which was normal procedure. I like to know about any doctor cases that the nurse handles and I didn't hear any more about it until I believe it was the 23rd, oh yes, the following day the nurse told me that the doctor called her and said that he had asked Juanita to stay home for the balance of the week until her hands cleared up and that that he would see her again Saturday and if her hands were better, she would go back to work Monday. On Monday morning she was ordered back to work, I believe it was the 23rd and the foreman called me and said she would be back to work and I told him at that time to put her

on a dry job and if he didn't have a dry job to let me know and I would arrange to move her to some other department. He said he had dry work for her and he would put her on it. The following day the nurse called me and said she had talked to Mrs. Beach and she was quite disturbed because she would not be paid for the three days that she was off, the preceding week and I then told her to have Mrs. Beach come up and see me and I would explain to her the workings of the Kentucky compensation law and probably she would be satisfied. She came up there and I did. I explained to her that it was the policy of the company to pay for the day the employee was taken ill and after that it became a compensation case and they would make payment under the compensation act and I also showed her the pamphlets and contracts with several of the other companies in the area, where they had the same policy. Some were not paid for the balance of the day but most of them do and she said, well if that's the way it is in most cases, why its okay with me and that was in the morning, Tuesday morning. On Tuesday afternoon she came back to my office and said that the setup man put her on a job that was bothering her hands and I said Juanita I have been out looking at the job you were working on and the foreman tells me to keep you on dry work but if you are unhappy I will move you to another department. I said I will see what I can find for you and she went back into the shop and a few minutes later I went out and talked to Foreman Lewis. I had met with him and he had asked me the day before if I had any girls because he was short a couple of girls, and I asked him if he would use Juanita for the rest of the month which was about four or five working days, and his answer was, I will be very happy to have Juanita. She worked for me about a year ago and she was a very good employee.

I then went over and told Juanita what had happened and first she said, I don't think I can work for Bob Lewis, and I said, why not? and she said, well, when I worked for him before we didn't get along and I said, well, I was surprised to hear her make that statement since Mr. Lewis had been very emphatic that he would like to have you working for him that you were a very good employee and that if there was any misunderstanding it must be all on her side because the foreman certainly didn't feel that way about it. She made no further objection and I assumed that everything was arranged. The following morning the regular foreman, Mr. Farris called me and asked me if I had arranged for the transfer of Juanita and I told him I had and explained to him what had taken place, that I had looked for him the previous afternoon and he said, okay, I will talk to Juanita. About ten minutes later Juanita Beach walked into the personnel office, threw her badge on my secretary's desk, she threw it so hard that it bounced off the desk into her lap, and all I heard her say was I am quitting and she turned on her heel and walked out the door.

Q. Did you ever have any subsequent conversations with Mrs. Beach in regard to this matter?

A. About ten days or two weeks, around the end sometime after the referee's decision was handed down on her unemployment compensation rights, I got a call from Mrs. Beach and I am going to try to quote her words as near as I can, she said, Mr. Jones, I just had to call you. My conscience has been bothering me so much I can't sleep at night. She said everything I said and done was false and she said I don't expect you to give me my job back after what I said and done but I sure need a job. I've got six children to support. She went on to say—I told her I was happy to hear her say that because I knew that was the case all the time.

She went on to say that the Union had put her up to it. They had come to her and asked her to make these statements so that Jane Montgomery could make a broadcast. That was the exact words she used."

The foregoing testimony of Mr. Jones was undisputed.

On the hearing before the Trial Examiner, Mrs. Montgomery relied on good faith in making the charges against the company in her broadcast. Mrs. Beach was not called as a witness.

Mrs. Montgomery testified she knew that violation of the rules of the company subjected an employee to disciplinary action ranging from warning to immediate discharge, depending upon the seriousness of the offense; and that she was acquainted with the rule providing for such disciplinary action against an employee making false statements concerning the company.

The Trial Examiner found that Mrs. Montgomery had been duped into making the false charges against the company and that it was unnecessary to resolve the truth or falsity of her statements.

There was no evidence that the charges against the company made by Mrs. Montgomery in her radio speech were true; they were false. Mrs. Montgomery also stated in her radio speech that the unfair treatment accorded by the company to Mrs. Beach was the same kind of treatment a great many people received from the company when they became injured or sick. When cross-examined on this latter statement as to who such people were, who received this unfair treatment, she was able to mention only four such cases, none of which were substantiated by her. One of these cases was employee Jones for whom an unfair practice labor charge was filed—but later withdrawn; another was employee Mahaney, who was discharged for excessive absences; another was one Joe Silva, whom nobody knew, and whose name never appeared in the personnel records as

having been employed by the company. As to the fourth person named, Mrs. Montgomery listed herself as one who had received such unfair treatment. In this regard, she testified:

"Q. You refer to yourself as receiving unfair treatment, what was the unfair treatment about?

A. I became injured on the job in the burr department and at that time I was sent to the company physician who put my right arm in a splint and during the time that arm was in a splint he told me I could work as long as the work they had for me involved only the use of my left hand and my foreman continually tried to put me on jobs that required the use of both hands.

Q. When was this?

A. That was in 1966, early in 1966.

Q. You weren't discharged for that?

A. No sir, I wasn't discharged.

Q. Was there any loss of work on your part as a result of this injury?

A. No, sir."

This was no evidence whatever that Mrs. Montgomery, as an injured employee, had been mistreated, or accorded any unfair treatment by the company.

There were over a thousand people employed by respondent company, and Mrs. Montgomery, up to the time of her radio speech, had been employed there for thirteen years. Her testimony that "This is the unfair treatment a great many people have received when they became injured or sick" was without substance, and was false.

The company was not looking for an excuse to discharge Mrs. Montgomery. In fact, they called her in and asked only for a retraction which she refused to give. If she had "gone back on the air and retracted that," Mrs. Montgomery testified, "there would have been no need of a separation." Although her union activities were well known to the respondent company, she admitted that she was never questioned, reprimanded,

or threatened in connection with its activities.

The radio speech of Mrs. Montgomery was calculated to expose the respondent company to public contempt as a company that refused to reassign employees to different work when their hands were badly affected by the chemicals with which they had to work, and, in lieu of giving them different work, discharged them even when physicians told such employees not to continue working with such chemicals. The statement, not communicated merely to the employees by Mrs. Montgomery, but broadcast over the radio to the public, not only exposed the company to public contempt but, as above said, was false.

There is no evidence nor any inferences to be drawn from the evidence that respondent company discharged Mrs. Montgomery because she engaged in concerted activity for the purpose of collective bargaining or other mutual aid and protection; and this was the only ground upon which the Trial Examiner's decision and the order of the Board were based. It is notable that in reply to the contention of the General Counsel, who claimed that the company's notice posted on the bulletin board, advising the employees that Mrs. Montgomery faced discharge unless she retracted her false and malicious statements, restrained, coerced and threatened them in violation of Section 8(a) (1) of the Act, the Trial Examiner disagreed and found that the purpose and effect of the notice was not to interfere with its employees' union activities, but rather to warn employees that false and malicious statements about the company would not be tolerated and the allegations of the complaint relative to the company's alleged violation of Section 8(a) (1) based on its posted notice, were dismissed.

Since, as we have heretofore held, there is no evidence or any inference to be drawn from the evidence that respondent company discharged Mrs. Montgomery because she engaged in concerted activity for the purpose of collective bargaining, or other mutual aid and protection, a decree of enforcement of the Board's decision and order will be denied.

EDWARDS, Circuit Judge (dissenting).

The company fired one Mrs. Montgomery for making a radio appeal for the union in which she said that an employee of Bowling Green had been fired for refusing to work on jobs which caused her to have a dermatitis condition on her hands. The company reacted by notifying Mrs. Montgomery that she had 48 hours in which to retract, because Mrs. Beach had in fact quit. Mrs. Montgomery declined to retract. She subsequently testified that her story and refusal to retract were based on what Mrs. Beach had told her. Respondent fired her. The Board found that this represented an 8(a) (1) violation and ordered reinstatement.

The record convinces me that at one point Mrs. Beach did throw her badge on the foreman's desk with some force. On this record it would appear the respondent had reason to consider that Mrs. Beach had indeed quit. But this does not mean that Mrs. Montgomery knew that Mrs. Beach had lied to her or that as a reasonable person Mrs. Montgomery was compelled to be convinced that she (Mrs. Montgomery) had repeated a lie.

On the issue of Mrs. Montgomery's good faith, the Trial Examiner found (and the Board affirmed):

"Viewing all the evidence, and appraising the demeanor of Mrs. Montgomery, whose testimony impressed me as being direct, forceful, and truthful, I find, as asserted, that she was told by Mrs. Beach what she related in her broadcast concerning the termination of Mrs. Beach's employment, and that she in good faith believed it to be the truth. The only consequential evidence submitted by Respondent concerning Mrs. Montgomery's knowledge of or good cause

to believe the falsity of the statements in her broadcast were her acquiesence in signing separation papers stating that she was discharged for publicly making false and malicious statements about the Company, and the alleged confession of Mrs. Beach to Jones 3 months after the discharge of Mrs. Montgomery, that the broadcast accusations against the Company were untrue and were instigated by the Union. I credit and find her explanation, as to why she signed the separation papers, adequately accounts for the signing and counteracts any inference that she thereby admitted the truth of the reason ascribed for her discharge. As for the effect of Mrs. Beach's confession, even if credited as having been made, it is significant to note that the confession was made in an attempt to recover her job under very trying circumstances—the necessity to support her six children. Under such circumstances it would not be unreasonable to suspect its veracity and to question its motive. Moreover, the confession did not directly implicate Mrs. Montgomery as a knowledgeable participant in the plan.[7] Thus, even

"7. It is significant to note in this regard that according to the uncontradicted testimony of Mrs. Montgomery, Jones told her at the time of her discharge, 'We are awfully sorry that you got taken in by this two-bit outfit.'

crediting Jones' testimony that Mrs. Beach confessed as asserted, I would conclude that Mrs. Montgomery was duped into making her broadcast.[8]

"8. No reason was advanced for either party's failure to call Mrs. Beach as a witness."

The enforcement of a company rule against union adherents prohibiting defamatory statements about the company in the course of protected activity in an organizing campaign is fraught with problems, including First Amendment ones. If discharge of union adherents under such a rule is to be approved under the NLRA, the proofs should show not only that the statement was false, but that it was maliciously made with knowledge of its falsity. Walls Mfg. Co. v. NLRB, 116 U.S.App.D.C. 140, 321 F.2d 753 (1963), cert. denied, 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166 (1963), enforcing 137 N.L.R.B. 1317 (1962); Marlin Firearms Co., 116 N.L.R.B. 1834 (1956). See also Linn v. United Plant Guards Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); NLRB v. Illinois Tool Works, 153 F.2d 811 (7th Cir. 1946); NLRB v. Peter Cailler Kohler Co., 130 F.2d 503 (2d Cir. 1942). Here the Board found that Mrs. Montgomery's statement was made in good faith and there is substantial evidence on the whole record to support that finding.

The order of the Board should be enforced.