**DREIS & KRUMP MANUFACTURING COMPANY, INC., Petitioner-Appellant,**

**v.**

**The NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee.**

**No. 75–2068.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1976.

Decided Nov. 3, 1976.

Ronald Wilder, Chicago, Ill., for petitioner-appellant.

Elliott Moore, Deputy Associate Gen. Counsel, Charles P. Donnelly, Carl L. Taylor, Attys., N.L.R.B., Washington, D. C., for respondent-appellee.

Before SPRECHER and WOOD, Circuit Judges, and WOLLENBERG, Senior District Judge.*

SPRECHER, Circuit Judge.

The primary issue arising from this labor dispute involves the question of whether the record, considered as a whole, contains substantial evidence supporting the conclusion of the National Labor Relations Board (hereinafter referred to as the "Board") that petitioner Dreis & Krump Manufacturing Company, Inc. (hereinafter referred to as the "Company") engaged in an unfair labor practice in its action of discharging an employee. For reasons set forth below, we enforce the order of the Board in all respects.

I

The essential facts giving rise to this appeal are not in dispute. Joseph P. Mayer, a milling machine operator employed by the Company was assigned a job and given blueprints and pieces of metal with which to accomplish it by the shop foreman, who was also his immediate supervisor, Joseph Mirabella. Mayer located the tools he believed appropriate and spent between four and six hours setting up his machine, although this task can ordinarily be completed within 90 minutes. Mayer attributed his lack of facility with the machine to his inexperience,[1] and testified that although Mirabella walked past him several times and observed his difficulty in setting up the machine properly, the foreman offered neither aid nor instruction. Several cutting tools broke when Mayer turned on his machine. Mayer reported the damage to Mirabella and was given a written warning, e. g., a "pink slip," for carelessness.

The collective bargaining agreement in effect provided for the settlement of disputes through a four-step procedure which culminated in final and binding arbitration. On the day following the machine incident, Mayer and several Union shop officials conducted an informal meeting with Mirabella and requested that Mirabella expunge the pink slip from Mayer's record.[2] Mirabella agreed to "forget the issue," but stated he was unable to remove the pink slip. A formal grievance charging Mirabella with negligence in overseeing safety and production was filed by the Union on behalf of Mayer.

At a second-stage grievance meeting held several weeks later and attended by Company and Union representatives, Mayer read aloud and distributed copies of his

* Honorable Albert C. Wollenberg, United States Senior District Judge for the Northern District of California, is sitting by designation.

1. At the time, Mayer had been in the position of a milling machine operator for approximately six months.

2. Mayer and the Union representatives apparently believed that the Company enforced a

rule requiring the discharge of an employee upon the event of his accumulating three warning notices, attested to by the observation of the Union shop chairman that "three pink slips and you are out, and we don't want to lose a good man." The Company Industrial Relations Director testified, however, that no such rigid policy of suspension or dismissal solely on the basis of warning slips existed.

personal view of the grievance.[3] The Union supported Mayer's contention that he had not been negligent, but the grievance remained unresolved.

The following morning, Mayer distributed copies of his grievance statement to Company employees and supervisors from a position at the entrance to the Company parking lot, along with an attached statement which read:

### ATTENTION ALL WORKERS

This case of J. Mayer v. J. Mirabella concerns ALL workers. We must not think that Mirabella is just peculiar. The Company knows what Mirabella does and supports him and all other foremen who act like him. WE DON'T HAVE TO TAKE IT !!!

Mayer ceased distribution ten minutes before the beginning of his shift. He was discharged within several hours for taking action interpreted as a bypass of the contractual grievance procedure, distributing a document to fellow employees which attacked a supervisor in derogatory and inflammatory terms and inciting fellow employees to engage in a walkout or slowdown.

A subsequent grievance filed by Mayer and the Union protesting the Company's decision was heard by an arbitrator, who determined that the discharge was supported by cause, since in distributing the materials to his fellow employees, Mayer had initiated an act of self-help. The arbitrator ruled that Mayer had thereby bypassed and aborted the grievance procedure, and forfeited his Section 7 rights. The arbitrator further noted that the critical tone of the language incorporated in the leaflet distributed by Mayer constituted a public attack upon a Company supervisor and exceeded the "bounds of fair comment," in contravention of a provision of the collective bargaining agreement which prohibited the posting of material derogatory to the Company or its employees.[4]

---

**3.** Mayer's statement read as follows:

The actions of J. Mirabella, machine shop foremen, [sic] with respect to me, J. Mayer, milling machine trainee, both before and after an event which occurred on January 16, 1974 (and in which 2 cutters were broken) constitute grounds for this grievance.

I maintain that J. Mirabella, in issuing the Employee Warning Record or "Pink Slip", was attempting, with malice, to shift the blame for his own negligence and carelessness onto me. The conditions immediately before and after the event verify my statement.

(1) While it ought to be the duty of a normal, ordinary foreman to closely supervise an inexperienced employee when setting up a complex four-cutter job, especially when the employee has had no experience with multiple cutters, J. Mirabella, knowing that I had no such experience assigned to me the job in question and then with gross negligence and carelessness failed to provide supervision, instruction or assistance to me.

\* \* \* \* \* \*

(4) The job in question takes about one and one-half hours to set up. J. Mirabella walked by the machine six times, peered at the work, saw that I was taking five hours to make the set up but did not stop to inspect or make measurements of the set up, even though it is the job of an ordinary, normal foreman to do so. Also note that the beginning rate I was being paid by the company demonstrates my beginner status.

(5) Furthermore, J. Mirabella, with malice, failed to correctly report the actual circumstances to his superior. But rather he reported only that part which relieved him of any blame and shift his negligence and carelessness onto me. An ordinary, normal foreman would come forward and accept the responsibility for his own actions. But J. Mirabella shifts the blame for his actions onto me and refuses to remove the humiliating burden of these actions from me.

I find J. Mirabella guilty of malice, gross negligence, carelessness and dissembling.

I recommend that:

A) The "Pink Slip" be immediately removed from my record.

B) Suitable and adequate compensation be made to me for the humiliation I have been forced to endure.

C) J. Mirabella be given a "Pink Slip" for negligence and carelessness.

**4.** The contention that the leaflet was intended to incite a walkout or a slowdown was rejected by the arbitrator, as was an assertion that Mayer had deliberately precipitated his discharge in order to take a previously planned European business trip and seek reinstatement and back pay upon his return. Since the record evidences no substantial support for these claims, we accept the determination of the arbitrator. *Universal Camera Corp. v. N.L. R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Board[5] refused to defer to the arbitrator's award, ruling that the Company violated Sections 8(a)(1) and (3) of the National Labor Relations Act ("Act") in discharging Mayer for participation in the type of concerted activity protected by Section 7 of the Act. The Board also concluded that a "no solicitation" rule[6] promulgated by the Company and apparently acquiesced in by the Union was so unduly broad on its face so as to constitute an unfair labor practice under Section 8(a)(1) of the Act. The Board issued an order directing the Company to cease and desist from the perpetration of these unfair labor practices and requiring the reinstatement of Mayer, as well as the payment to him of any damages necessary to make him whole for any loss of pay suffered as a consequence of the Company's discriminatory conduct.

The Company petitions this court for review of the Board's order and the Board cross-petitions for its enforcement.

## II

■ As a preliminary matter, we note that the Company has not contested that portion of the Board's order declaring promulgation of the "no solicitation" rule an unfair labor practice under Section 8(a)(1) in either its brief or oral argument. On its face, the rule is unrestricted in its application to employee-related activities and is clearly susceptible of overbroad interpretation and enforcement. Accordingly, the Board's finding that maintenance of the "no solicitation" rule is an unfair labor practice is appropriate and we enforce it without further discussion. *Riverside Press, Inc. v. N.L.R.B.*, 415 F.2d 281, 284–85 (5th Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970); *N.L.R.B. v. Tennessee Packers, Inc.*, 344 F.2d 948, 949 (6th Cir. 1965).

## III

We next consider the essential issue in this case: whether the record, considered as a whole, contains substantial evidence to buttress the determination of the Board that the discharge of Mayer contravened his Section 7 rights,[7] in violation of Sections 8(a)(1) and (3)[8] of the National Labor Relations Act. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The arbitrator's primary basis for sustaining Mayer's discharge was his finding that Mayer, in bypassing the established grievance procedure as a means of resolving his claim, violated the collective bargaining agreement.[9] The Board rejected his determination, concluding instead that Mayer sought "not to disparage the established

---

**5.** This determination was initially made by an Administrative Law Judge; a three-member panel of the National Labor Relations Board unanimously upheld the result reached.

**6.** The rule stated as follows:

There should be no solicitation by any employee, unless permission is expressly granted by the personnel department.

Testimony indicated that application of the rule was intended to be restricted to monetary solicitations. However, it is indisputable that the rule might be broadly interpreted to extend to solicitations of any kind, even those relating to basic employee rights under Section 7 of the Act.

**7.** 29 U.S.C. § 157. The statute provides in pertinent part:

Employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

**8.** 29 U.S.C. §§ 158(a)(1) and (3). In pertinent part, the statute provides as follows:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [Section 7];

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

**9.** Section 4.1 of the Collective Bargaining Agreement provides in pertinent part:

(A) Any grievance arising under the terms of this agreement between the Company and the Union or any employee shall be processed in the following manner and each grievance shall be regarded as an individual case.

procedure but to enhance it." The question of whether Mayer's activity is protected and concerted, as contemplated by Section 7, is therefore dependent in the first instance upon a determination of whether the leafletting served to augment or to abort the existing grievance procedure.

 Section 7 affords employees basic rights of self-organization and self-determination in an industrial setting, through the means of selecting representation to participate in collective bargaining with their employer. *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 61–62, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975). The Act does not tender protection to activity by employees, albeit concerted, which abandons the principles of exclusive representation by circumventing established grievance procedures, and attempts instead to bargain with the employer regarding working conditions on separate terms. We do not disaffirm the existence of a national policy which favors resort to grievance procedures to settle labor disputes. However, an employee, on the basis of existing authority, can be charged with contravention of an established grievance procedure only where he deliberately spurns Union auspices and instead attempts to directly initiate negotiations with his employer regarding working conditions. *Emporium, supra; Moore v. Sunbeam Corp.*, 459 F.2d 811 (7th Cir. 1972); *United Parcel Service, Inc.*, 84 L.R.R.M. 1098, 205 N.L.R.B. 991 (1973).

 This situation is not present in the instant case. Mayer's grievance was pending, in accordance with established contractual procedures, and, as the Board found, the message he distributed to his fellow employees was consistent with orderly resolution of that grievance. Mayer sought no separate pact or negotiations with his employer; rather, his activity was directed toward eliciting the support of his co-workers in the resolution of his grievance. Had Mayer not been discharged as a result of his leafletting activity, no reason appears, and none is advanced by petitioner, why processing of Mayer's grievance could not have progressed in an orderly manner to the next stage of the agreed-upon grievance mechanism.

By contrast, the employees in *Emporium, supra,* and *Moore, supra,* sought through the exertion of economic pressure to compel their respective employers to bargain separately with them. In both cases, the employees directed their activities toward their employers' customers through urging a boycott of the employers' products, and acted wholly contrary to the advice of the Union, their designated representatives in collective bargaining, concerning the merits of their specific grievances. Mayer attempted no commercial boycott of the Company's goods and directed his printed remarks solely toward his fellow employees. Further, Mayer enjoyed full Union support in the prosecution of his particular grievance.

It is urged by petitioner that the leaflet distributed by Mayer disparages the contractual grievance procedure. on its face, since the printed material makes no specific reference to either the progress of the resolution of his individual grievance or the mechanism by which similarly dissatisfied employees might file individual grievances on their own. Mayer's specific claim involved an alleged lack of proper, adequate, and effective instruction and supervision. He testified that his inclusion of the language "We don't have to take it," as directed toward his co-workers was intended as a personal appeal, either to encourage their personal and moral support in his third stage grievance procedure, or to urge workers to file similar grievances. We are unpersuaded by petitioner's contention that if Mayer was truly interested in involving his fellow employees, he would have made a more articulate and direct appeal than the words used connote. Mayer was neither writing a manifesto of worker's rights nor promulgating a complete program of detailed instructions pertinent to the utilization of grievance procedures. He was attempting to elicit support, by means of seeking witnesses to aid in furthering satisfactory resolution of his grievance and stimulating others to file whatever similar

grievances they might hold. His language is eminently suited to accomplish that intent. That his choice of phraseology might have been more particularly or effectively directed toward his desired result is irrelevant. Accordingly, we find no occasion to disturb the finding of the Board that Mayer's leafletting activity served to complement, rather than circumvent, the established grievance procedure. 29 U.S.C. § 160(f); *Universal Camera, supra,* 340 U.S. at 491, 71 S.Ct. 456.

■ Petitioner next asserts that the protection afforded by Section 7 does not encompass Mayer's conduct because he engaged not in protected, concerted activity, as envisioned by the Act, but rather acted individually and without official Union sanction to vent a personal gripe. The guidelines governing the determination of whether employees' conduct invokes the protective cloak of Section 7 have been clearly set forth by this court. In order to establish that certain conduct is concerted activity, and thereby protected, "it is necessary to demonstrate that the activity was for the purpose of inducing or preparing for group action to correct a grievance or a complaint." *Indiana Gear Works v. N.L. R.B.,* 371 F.2d 273, 276 (7th Cir. 1967). In enacting Section 7, Congress manifested an intention to safeguard the right of employees to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." This protection remains viable only if interpreted to encompass not only activity which occurs within the confines of a formal grievance proceeding, but also conduct which intends or contemplates as its end-result group activity which will benefit the participants in their status as employees. *Cf. N.L.R.B. v. Local 1229,* 346 U.S. 464, 474, 74 S.Ct. 172, 98 L.Ed. 195 (1953); *Owens-Corning Fiberglass Corp. v. N.L.R.B.,* 407 F.2d 1357, 1365 (4th Cir. 1969); *Mushroom Transportation Co., Inc. v. N.L.R.B.,* 330 F.2d 683 (3d Cir. 1964). Thus, the fact that Mayer's leafletting activity occurred outside the course of a formal grievance proceeding is not dispositive. Rather, our inquiry focuses upon the question of whether a proper purpose within the contemplation of Section 7, underlays Mayer's actions.

■ Mayer distributed a leaflet to his co-workers which publicized his allegations regarding a lack of supervisory instruction and diligence which Mayer believed, and the Union agreed, created hazards to the safety of the workers as well as to the maintenance of production levels. The leaflet also attributed such negligence to other supervisors and appealed to employees to initiate some type of group activity. Mayer testified that he sought to exhort workers either to come forth as witnesses in support of his pending grievance or to file individual grievances relating to supervisory negligence. In either case, such purpose is properly construed as the inducement or initiation of group activity which seeks to enforce the provisions of the collective bargaining agreement pertinent to use of the grievance procedures. This in itself is sufficient to bring Mayer's conduct within the ambit of Section 7.

■ Moreover, as the Board found, Mayer's activity is founded upon a purpose of alerting his fellow employees to what he discerned as ineffective, negligent supervision which potentially held an adverse impact upon the manner in which employees performed their jobs. The grievance submitted by the Union on Mayer's behalf emphasized that the employees' safety was potentially jeopardized by the type of supervisory conduct of which Mayer complained, certainly a legitimate concern of all employees. A protest arising from allegedly improper supervisory conduct furthers the "mutual aid or protection" of the employees, particularly where the supervisor's actions imperil the safety of the workers and also may result in their unwarranted discipline, as occurred here.

■ In this context, *Joanna Cotton Mills v. N.L.R.B.,* 176 F.2d 749 (4th Cir. 1949), relied upon by petitioner, is particularly instructive. There, an employee was discharged after he circulated a petition requesting that a supervisor be terminated

due to his unsatisfactory performance. In refusing to enforce the Board's reinstatement order, the court agreed that circulation of the petition was the cause of the employee's termination, but found this conduct unprotected by Section 7, since the circumstances preceding initiation of the petition were that the supervisor had disciplined the employee for operating gambling devices and being overly attentive to female employees during working hours. Conducting such personal affairs bore little relation to the collective bargaining process or to matters involving any type of aid to or protection of other employees. Thus, the employee's protest against being disciplined arose not from a purpose cognizable under Section 7. By contrast, alerting one's fellow employees to supervisory deficiencies which potentially affect on-the-job safety and performance cannot seriously be contended to further a purpose other than their "mutual aid or protection," regardless of any personal feelings of anger on the part of Mayer toward his supervisor.[10]

■ Nor is the fact that Mayer proceeded alone in his leafletting, without Union sponsorship, pertinent to the determination of whether such conduct is protected by Section 7. These protections are not withheld from persons who engage in concerted activity stemming from a purpose contemplated by the Act, but who act neither through nor on behalf of unions. *Indiana Gear, supra; Joanna Cotton Mills, supra* at 752. Furthermore,

> [t]he activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much "concerted activity" as is ordinary group activity. The one seldom exists without the other.

*Owens-Corning Fiberglass, supra* at 1365. *See also Hugh H. Wilson Corp. v. N.L.R.B.,* 414 F.2d 1345 (3d Cir. 1969), *cert. denied,* 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1969).

Therefore, we uphold the Board's conclusion that the purpose for the distribution of the leaflet was directed toward allegedly inadequate supervision as it concerned safety, instruction and discipline, a purpose protected by Section 7.

■ Petitioner's final contention in this regard is that Mayer's discharge was justified because he forfeited the protections of the Act by his public use of scurrilous, abusive and derogatory language in reference to both his supervisor and the Company, which constituted disloyalty to his employer. We reject this assertion. Petitioner's attempt to equate Mayer's message regarding supervision, directed solely toward his fellow employees, to public disparagement of an employer's product, *cf. N.L.R.B. v. Local 1229,* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953); *Patterson-Sargent Co.,* 38 L.R.R.M. 1134, 115 N.L.R.B. 1627 (1956), or public discrediting of an employer's practices, *cf. Bowling Green Mfg. Co. v. N.L. R.B.,* 416 F.2d 371 (6th Cir. 1969) is unpersuasive. Distribution of the leaflet to coworkers concerned a grievance which encompassed areas of legitimate concern to employees. No mention of the Company's products was made, and no attempt to expose the Company to public ridicule or contempt through the dissemination of false or malicious statements was attempted or effected. The position of both Mayer and the Union in initiating a grievance was that supervisory negligence in the course of overseeing safety and production, rather than negligence on the part of Mayer, caused the damage which led to disciplinary action. This position affords a reasonable basis for Mayer's belief that he had a legitimate grievance and should enlist the support of his co-workers. *N.L.R.B. v. Ben Pekin Corp.,* 452 F.2d 205 (7th Cir. 1971).

Mayer's statement attributed "malice, gross negligence, carelessness and dissem-

---

10. The motive of the actor in a labor dispute must be distinguished from the purpose for his activity. The motives of the participants are irrelevant in terms of determining the scope of Section 7 protections; what is crucial is that the purpose of the conduct relate to collective bargaining, working conditions and hours, or other matters of "mutual aid or protection" of employees. *Joanna Cotton Mills, supra* at 753.

bling" to his supervisor and declared that the Company was cognizant of and supported such conduct. Petitioner argues that these statements, in and of themselves are so abusive and inflammatory as to warrant discharge. In *N.L.R.B. v. Thor Power Tool Co.,* 351 F.2d 584, 587 (7th Cir. 1965), this court recognized that:

> [F]lagrant conduct of an employee, even though occurring in the course of section 7 activity, may justify disciplinary action by the employer. On the other hand, not every impropriety committed during such activity places the employee beyond the protective shield of the act. The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect. . . . Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed (citation omitted).

 Clearly, the employer retains the sole right to manage its business, including the right to discharge or discipline employees, so long as the protections afforded by the Act are not contravened. Here, however, the Board's determination that Mayer's statements were not "so offensive, defamatory or opprobrious so as to remove them from the protection of the Act" is sound and will not be disturbed.

 Petitioner vigorously advocates adoption by this court of the standard utilized by the arbitrator in this case in determining that the statements at issue exceeded the protection of the Act: whether a statement might be characterized as "beyond the bounds of fair comment." The cases cited by petitioner, however, fail to support this proposition, for each case evidences an element of egregiousness in the conduct of the discharged employee which simply is not present here.[11] Furthermore, this court is committed to the standard for determining whether specified conduct is removed from the protections of the Act as articulated by the Board: communications occurring during the course of otherwise protected activity remain likewise protected unless found to be "so violent or of such serious character as to render the employee unfit for further service." *N.L.R.B. v. Illinois Tool Works,* 153 F.2d 811, 816 (7th Cir. 1946); *see also Ben Pekin, supra* at 207.[12]

 We are not dissuaded from granting enforcement of the Board's order by petitioner's claim that adoption of the findings of fact of the arbitrator by the Board compels adherence to his ultimate factual finding, that Mayer engaged in personal, unprotected, rather than concerted, activity. The question of whether Section 7 protection encompasses Mayer's conduct is a legal determination, the resolution of which lies initially within the expertise of the Board. *Universal Camera, supra; Thor Power Tool, supra.* Our review of the record as a whole establishes that the conclusion of the Board is predicated upon substantial evidence, and its order is enforced.

---

11. *See, e. g., Mississippi Valley Structural Steel Co.,* 35 Lab.Arb. 506 (1960), where an employee was discharged following a long and continuous history of abusive and violent conduct toward both supervisors and his fellow employees. The arbitrator ruled that the employee, through such egregious behavior, had "forever destroyed any possibility or probability that he could in the future continue in employment with the Company," and upheld the discharge. *Id.* at 508. *See also General Controls Co.,* 35 Lab.Arb. 109 (1960); *New Era Letter Co.,* 33 Lab.Arb. 294 (1959); *Kuhlman Builders' Supply & Brick Co.,* 31 Lab.Arb. 52 (1958). In each of these cases, an employee's termination was upheld only because the language at issue was vile and obscene, as well as abusive.

12. Petitioner further contends that Mayer's discharge was justified because he violated a provision of the collective bargaining agreement which allowed the Union a place in which to post notices, so long as "[n]othing derogatory to the Company or its employees" was displayed. We thoroughly agree with the Board's determination that, even if this provision is applicable to distributions as well as postings, the Union lacks jurisdiction to waive the rights of employees to disseminate materials in nonwork areas during nonworking hours. *N.L.R.B. v. Magnavox Co.,* 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974).

## IV

■ Petitioner also raises several contentions pertinent to the procedural course of this case. First, petitioner insists that Board policy, as promulgated in *Spielberg Mfg. Co.*, 36 L.R.R.M. 1152, 112 N.L.R.B. 1080 (1955), mandates deferral by the Board to the arbitral award in this case. Briefly, *Spielberg* necessitates deferral to an arbitrator's determination when several conditions have been fulfilled: (1) the proceedings were fair and regular; (2) the parties had agreed to be bound by arbitration; and (3) the arbitral award "is not clearly repugnant to the purposes and policies of the Act." This policy of deferral, adopted in order to obviate duplicative litigation, does not supersede existing statutory and case law which authorizes the Board, in the exercise of its expertise, to determine the existence of an unfair labor practice. Section 10(a) of the Act provides:

> The Board is empowered . . . to prevent any person from engaging in any unfair labor practice. . . . This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . . .

*See also Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 272, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); *Thor Power Tool, supra*. This duty may not be wholly delegated to the arbitrator. *Carey, supra.*

In this case, the Board was faced with only the question of whether the resolution reached by the arbitrator that Mayer's discharge was for cause, and therefore proper, reflected incompatibility with the policies underlying Section 7 of the Act. Since we uphold the Board's conclusion that the Company's termination of Mayer contravened his Section 7 rights and constituted an unfair labor practice in violation of Sections 8(a)(1) and (3) of the Act, we find that the Board was clearly warranted in rejecting an arbitral award which condoned an unfair labor practice as repugnant to the purposes and policies of the Act.

■ Next, petitioner maintains it was not afforded a fair hearing in violation of procedural due process because the Administrative Law Judge improperly restricted the scope of evidence adduced at the hearing. Specifically, the Company claims it was impermissibly precluded from relitigating the question of whether Mayer acted in bad faith by purposely precipitating his discharge in order to take a previously planned business trip to Europe. We reiterate that the sole issue to be resolved by the Judge was whether the arbitration result was repugnant to the policies and purposes of the Act. Only evidence pertinent to this question was permitted to be introduced. Since the arbitrator had previously rejected any notion that Mayer was motivated by bad faith, evidence relating to this question formed no part of the basis for the arbitral award which was at issue in the unfair labor proceedings, and was properly excludable on materiality grounds.[13]

Petitioner's related contentions that the Judge exhibited partiality toward General Counsel in his rulings and misconstrued the doctrine pronounced in *Electronic Reproduction Service Corp.*, 87 L.R.R.M. 1211, 213 N.L.R.B. No. 110 (1974) are without merit. Nothing in the *Electronic Reproduction* case obviates the independent duty of the Board to refuse deferral to an arbitral award wholly incompatible with labor policy because it condones an unfair labor practice, and to develop a complete record on this question.

Finally, petitioner argues that Section 10(e) of the Act and Section 557(c) of the Administrative Procedure Act were violated through the Board's failure to delineate specific findings of fact upon which its conclusions were premised. We disagree. The

---

13. Petitioner's claim that "additional evidence" supporting this theory, in the form of pre-trial affidavits sworn by Mayer, required relitigation of the bad faith issue is unfounded. Although admissible as the admission of a party opponent in the proceedings before the Administrative Law Judge, Fed.R. of Evid. § 801(d)(2), the statements are wholly lacking in materiality and devoid of any evidence of a premeditated plan on the part of Mayer to compel his own discharge.

Administrative Law Judge painstakingly detailed his findings of fact relative to the repugnancy question, and these findings were affirmed by the Board.

The record as a whole contains substantial evidence supporting the Board's conclusion that petitioner engaged in an unfair labor practice in terminating Mayer, and its order is

ENFORCED.