**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PB&S CHEMICAL, INCORPORATED,
Petitioner,

v.                                                          No. 96-1971

NATIONAL LABOR RELATIONS BOARD,
Respondent.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                          No. 96-2065

PB&S CHEMICAL, INCORPORATED,
Respondent.

On Petition for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(6-CA-27107, 6-CA-27265)

Argued: April 9, 1997

Decided: August 26, 1997

Before HAMILTON and MOTZ, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Petition denied and enforcement granted by unpublished opinion.
Senior Judge Phillips wrote the opinion, in which Judge Hamilton and
Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** C. Laurence Woods, III, WESTFALL, TALBOTT & WOODS, Louisville, Kentucky, for Petitioner. Sharon I. Block, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Matthew R. Westfall, WESTFALL, TALBOTT & WOODS, Louisville, Kentucky, for Petitioner. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Linda Dreeben, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

PB&S Chemical Company, Inc. (PB&S) has petitioned for review of a decision by the National Labor Relations Board (NLRB or "Board") finding it in violation of the National Labor Relations Act (NLRA) for terminating two employees for refusing to cross another company's employees' picket line. The NLRB has cross-petitioned for enforcement of a final Board order issued against PB&S. We find no error in the Board's decision and therefore deny the petition for review and grant enforcement of the Board's order.

I

PB&S is a chemicals distribution concern, purchasing bulk chemicals, repackaging and selling them to various customers including large industrial enterprises. With headquarters in Henderson, Kentucky, PB&S operates branches in Pennsylvania and West Virginia, including Proctor, West Virginia, where Charles Beaver and Kenneth Seagrave were employed as truck drivers. Beaver had been working

2

for PB&S since 1982; Seagrave was hired in 1986. Beaver and Seagrave were supervised in Proctor by Charles Duncan, who was the branch manager, and Ed Ankrom, who was the plant manager and dispatcher and reported to Duncan. PB&S's employees were not represented by any labor organization for collective bargaining purposes.

In November 1994, PB&S drivers began making deliveries to a Union Camp Company facility in Dover, Ohio. On December 8, 1994, Beaver witnessed an altercation between two Union Camp employees while he was delivering chemicals to the Dover plant. The two employees were evidently arguing about a labor-related issue, with one supporting the labor position and the other defending the management position. A pro-union employee approached Beaver and asked for his name and address so that he might serve as a witness. Beaver refused to cooperate. One of the "union people" then gave Beaver his name, address and phone number to contact him, but Beaver threw the information away. That month, Beaver and Seagrave learned that a strike was imminent at the Union Camp facility. They spoke with Duncan and told him they did not want to cross any picket lines established by Union Camp employees. Seagrave told Duncan that he "did not feel it was right that [he] be put in a position with the employees at Union Camp, but [he] had nothing directly involved with them and that [his] personal safety was involved in it." Beaver had emphasized to Duncan several times in relation to the imminent Union Camp strike, that "[he] felt that they were dangerous, that [his] life could be harmed and that . . . [he] didn't believe in messing with another man's job." Beaver had previously refused to cross another picket line and had not been disciplined then, and Seagrave testified that Duncan had told the employees that they would not have to cross Union Camp's line in the event of a strike. Duncan testified that he warned them that PB&S's policy was to continue to make deliveries unless there was "a real threat of violence."

The events of December 19 serve as the origins for this dispute. Early that morning, Seagrave left Proctor to deliver chemicals to the Union Camp facility. When he got within four blocks of the Dover plant, at approximately 7:00 AM, a Union Camp employee called Seagrave on his CB to tell him that a picket line had been set up and to ask him not to cross it. Seagrave pulled into a nearby restaurant and called Ankrom, telling him the strike was under way and that he

3

would not cross the picket line. Ankrom asked him to remain in Dover. When Duncan arrived at work soon thereafter, he called Union Camp and was informed that trucks were entering and leaving freely. A Union Camp official also called Seagrave to tell him that trucks were entering and leaving the facility without incident, despite the presence of the pickets. Seagrave steadfastly refused to make the delivery, and called Duncan. Duncan told him that the Union Camp officials would guarantee protection as he made his delivery, but Seagrave stated that he would not cross the picket line. In his subsequent testimony Seagrave identified two reasons that he gave to Duncan that day. First, while he might be protected while making the delivery, "there was always the possibility of . . . going down the road ten or fifteen miles and then a rock throw (sic) my windshield." JA 41. Also, Seagrave explained that he would not make the delivery because "it put [him] in a bad position with the employees up there." JA 41A. Seagrave returned to Proctor without making the delivery.

That same morning, Beaver was preparing to make a trip from Proctor to another PB&S facility in Nitro, West Virginia. Ankrom told Beaver of Seagrave's refusal to cross the Union Camp picket line, and Beaver responded that he thought that Duncan had declared that he would tell the drivers of impending strikes at Union Camp before they made their deliveries so as to avoid crossing the picket lines. While Beaver was present, Ankrom also spoke to Duncan, who said that he had spoken with PB&S's president and vice president and that they had told Duncan that the deliveries must be made to Union Camp, "or else." Duncan then turned to Beaver and asked whether he knew where Union Camp's main gate was. Beaver responded that he did, and Duncan stated, "So that's where you will be going in at." JA 47. Beaver said nothing at this time, but later testified that he understood Duncan's comment, in light of Beaver's previous refusals to cross picket lines and conversations concerning Union Camp specifically, to be an ultimatum. Shortly after that brief discussion, Beaver asked Ankrom whether he should clean his truck out that day or wait until the next day to be fired. Ankrom did not respond, so Beaver removed his belongings from his truck, turned in his keys and demanded of Duncan that he be paid the money he had deposited in his pension fund, observing that his relationship with PB&S had been in effect terminated.

4

When Seagrave returned to Proctor, he removed his belongings from his truck and saw Duncan and Ankrom. Duncan's and Seagrave's accounts of that meeting varied widely. Duncan testified that Seagrave was very angry, cursing Duncan and expressing fear of personal injury if he crossed the picket line. Seagrave testified that he simply declared that he would not cross the picket line because it put him "in a bad position with employees" and demanded to know whether he was fired. Both agree that Duncan did terminate Seagrave, though Duncan asserted it was because of his lack of cooperation in resolving the situation and for his lack of respect in cursing him. Seagrave testified that Duncan fired him simply for failing to make the delivery. Duncan's termination report form, completed that day, supports Seagrave's version in that it states that he was terminated for "refus[ing] to make a delivery to a customer." JA 136.

Though Beaver had left the Proctor plant on the morning of December 19, Ankrom called and asked him to return to discuss the matter with Duncan. The three met that afternoon, and again the testimonial accounts of what then occurred vary. Duncan testified that he asked Beaver to come back but that he would have to deliver chemicals to Union Camp, stating that it would be safe for him to do so. Beaver refused, according to Duncan because he could not "risk being hurt." JA 76. Beaver claims he reminded Duncan of his recent problems with the union at the Union Camp facility and that he had previously refused to cross a picket line the year before and had not been disciplined. According to Beaver, Duncan responded that Beaver should have been fired for that. JA 52. Beaver then asked what had happened to Seagrave, and Duncan informed him that he had been discharged. Beaver then stated that he considered himself terminated, and Duncan retorted that Beaver instead had quit. Duncan's termination report stated that Beaver turned in his keys because he refused to make the delivery to Union Camp and cross the picket line. JA 135.

In the wake of these incidents, the NLRB charged PB&S with improperly terminating Beaver and Seagrave for engaging in activity protected under § 7 of the National Labor Relations Act (NLRA), 29 U.S.C. § 157 (1994). Beaver, Seagrave, Duncan, and Ankrom testified at the ensuing hearing before an Administrative Law Judge (ALJ). The ALJ expressly found more credible Seagrave's and Beaver's accounts of the events than Duncan's. JA 16, 19. On this basis,

5

the ALJ then found that Seagrave and Beaver were terminated because of their refusal to cross the Union Camp picket line. On the assumption that, per the Board's position, such refusals are protected activity under § 7 without regard to the refuser's motivation, the ALJ concluded that PB&S had violated §§ 8(a)(3) and (1) of the NLRA, 29 U.S.C. §§ 158(a)(3) and (1) (1994), by terminating them for their refusals. But, noting that some courts, including this court, consider that motivation is relevant to whether a particular refusal is protected, the ALJ as a measure of prudence addressed the evidence of motivation "in the event of review." JA 22. Doing so, the ALJ found that "one of [their] concerns . . . was, clearly, their fear of being badly injured" and that they indicated to PB&S management that this was their "primary reason for refusing." But, the ALJ further found that "both [employees] also wanted to avoid giving the appearance to strikers of siding with management against the strikers" and "also communicated this to . . . management, albeit less clearly." Id.

The NLRB, reviewing the ALJ's decision, essentially agreed with the ALJ's critical findings of dual motivation, but reformulated them to find "that both drivers were equally concerned with remaining neutral in the labor dispute and with their personal safety." JA 6. In support, the Board cited testimony in which both Beaver and Seagrave stated that they told Duncan they did not want to be involved in the Union Camp employees' dispute with management as indicating that fear alone was not their reason. JA 5-6. On this basis, the NLRB concluded that Beaver and Seagrave were engaged in protected activity within the meaning of § 7 of the NLRA. In so holding, the Board expressly distinguished on its facts this case from NLRB v. Union Carbide Corp., 440 F.2d 54 (4th Cir. 1971), in which this court had held that an employee who refused to cross a picket line solely because of fear for personal safety did not engage in protected activity as defined by § 7.

These cross-petitions for review and enforcement followed.

II

On the issues joined in the petition and cross-petition, our decision turns on the proper interpretation and application of our decision in Union Carbide. In that case, we held that an employee's motivation

6

for refusing to cross a picket line can determine whether it is "protected activity" under § 7.**1** Specifically, we held that if fear alone is the motivation, a refusal is not protected activity, id. at 56; that to be protected, the refusal must have been done "as a matter of principle" in support of other employees. Id. at 55.

Invoking these holdings, PB&S contends (1) that there was not substantial evidence to support the Board's finding that the refusals were motivated by anything but the employees' conceded fear of physical injury, and (2) that, in any event, the other "equal" reason found--a desire "to remain neutral"--is not one "of principle," hence does not meet Union Carbide's test of protected activity.

We take these in turn.

A.

There is substantial evidence of the record that the employees had and repeatedly identified "twin concerns of personal safety and noninvolvement" in explaining to Duncan why they refused to cross the Union Camp picket line. JA 5. Seagrave testified that he had told Duncan that crossing the line "put me in a bad position with the employees and . . . I shouldn't be involved with what was going on over there. That was between Union Camp and their employees." JA

_____

**1** The NLRB argues that the Supreme Court implicitly overruled that aspect of our Union Carbide decision in NLRB v. J. Weingarten, Inc., 420 U.S. 251 (1975). There, in the context of determining whether an employee "reasonably believes an investigation will result in disciplinary action," the Court reaffirmed that "it would`reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry.'" 420 U.S. at 257 and 257 n.5 (quoting NLRB v. Gissel Packing Co., 395 U.S. 575, 608 (1969)). Though other circuits since have held that an employee's motivation not to cross a picket line is irrelevant to the refusal's status as "protected activity" see NLRB v. Mike Yurosek & Son, Inc., 53 F.3d 261, 266 (9th Cir. 1995); Dreis & Krump Mfg. Co., Inc. v. NLRB, 544 F.2d 320, 328 n.10 (7th Cir. 1976), we do not believe that Weingarten's rejection of motivational inquiry in the quite different context there involved so clearly undercuts Union Carbide's continued authority on that point in this circuit that we must consider it overruled to that extent.

7

35. On the morning of December 19, when Seagrave told Duncan he would not cross the line after Duncan told him it was safe to do so, Seagrave said that he still "didn't feel right about it." JA 38. After Duncan tried to convince Seagrave that it was safe to make the delivery once Seagrave had returned to Proctor, Seagrave maintained that he would not cross the line not only because he thought it was unsafe but because it "put [him] in a bad position with the employees up there." JA 41A. Similarly, Beaver had made clear that he would not cross another picket line in 1993, without mentioning his personal safety, and had told Duncan several times before the Union Camp episode that he would not cross picket lines because"[he] didn't believe in messing with another man's job." JA 55. Admittedly, Beaver also had told Duncan about the December 8 incident at Union Camp and that he was concerned about retaliatory acts by union members there, and that he believed crossing picket lines to be dangerous. JA 54-55. Nevertheless, the record is replete with evidence that supports the Board's determination that both Beaver and Seagrave were substantially motivated by a desire to remain neutral in the Union Camp strike in their resolution not to cross the picket line.

Our conclusion on this point is not swayed by PB&S's contention that we must review this dual motive finding of the Board with "special scrutiny" because it conflicts with the ALJ's opinion. See Weather Shield Mfg., Inc. v. NLRB, 890 F.2d 52, 57 (7th Cir. 1989). Universal Camera long ago made clear that "the `substantial evidence' standard is not modified in any way when the Board and its examiner disagree." Universal Camera Corp. v. NLRB, 340 U.S. 474, 496 (1951). Courts properly have recognized that Board decisions might be viewed with more suspicion when they ignore the credibility determinations of ALJs who, unlike the Board, are able to observe witnesses. Universal Camera, 340 U.S. at 496-97; Blackburn v. Martin, 982 F.2d 125, 128 (4th Cir. 1992); Weather Shield, 890 F.2d at 57. Here, however, the Board explicitly adopted the ALJ's credibility determinations as to the critical historical facts, and simply drew a slightly different inference than did the ALJ as to the nature of the dual motivation which both agreed drove the employees' conduct.

B.

PB&S's alternative contention is that even if the Board's finding that an equal reason for the employees' conduct was a desire to "re-

8

main neutral" in the Union Camp labor dispute is upheld, that reason does not suffice under Union Carbide to make their refusal to cross the picket line protected activity. Union Carbide, says PB&S, requires that to be protected activity, such a refusal must be motivated by a principled purpose to give aid to the striking picketers, and "remaining neutral" is not action "in principle."

The NLRB has two responses. First, that this contention, not having been raised before the Board, may not be raised for the first time in this court on a petition for review. Second, that, on the merits, it fails; an employee's refusal to cross other workers' picket line out of a desire to remain neutral is necessarily action "on principle" since it necessarily benefits the picketers over management.

We agree with the NLRB that PB&S is precluded from raising this issue for the first time on their petition for review in this court. Section 10(e) of the NLRA, which defines the jurisdiction of courts of appeals in review of Board decisions, provides:

> No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

29 U.S.C. § 160(e)(1994).

This provision acts as a jurisdictional limitation on our review powers that can only be avoided by the showing of extraordinary circumstances for the procedural default. Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 666 (1982); see also NLRB v. Daniel Constr. Co., 731 F.2d 191, 198 (4th Cir. 1984). PB&S claims excuse here because, it contends, the finding of "remaining neutral" as a motivation only occurred in the Board's decision, so that PB&S had no fair opportunity to urge its objection to this as a legal ground, either before the Board or earlier in the adjudicatory process. We reject this on two grounds. Most directly, because it was possible, even if this finding did first appear in the Board's decision, for objection to have been made by a motion for reconsideration by the Board. See International Ladies' Garment Workers' Union v. Quality Mfg. Co., 420 U.S. 276, 281 n.3 (1975). Secondarily, because we doubt, in

9

any event, the accuracy of the suggestion that, for purposes of evoking a legal objection, this finding of an added motive to that of fear only first appeared in the Board's decision. Though the ALJ had noted his understanding that under the NLRB's legal position the question of motivation--_any_ motivation--was irrelevant to whether a refusal to cross a picket line was protected activity, he nevertheless had made express findings of the motivation he attributed to these employees. It was--though in language that did not employ the "remain neutral" term used by the Board--essentially the same dual motivation. To repeat, as the ALJ put it: "One of[their] concerns . . . was, clearly . . . their fear of being badly injured" but, he added, "both . . . also wanted to avoid giving the appearance to strikers of siding with management against the strikers." JA 22. Before the Board, PB&S did not contend that this additional motive was not one which, under Union Carbide, could not properly be considered one "of principle," but only that there was not substantial evidence to support it, there being only supportable evidence of fear. The Board's finding essentially simply transmuted, though concededly with more precision, the ALJ's finding of a motive of desiring to"avoid giving the appearance . . . of siding with management" into one of wanting to "remain neutral."

We agree with the NLRB that under § 10(e), PB&S's failure at any point in the agency adjudicatory process to raise this purely legal issue, precludes our consideration of it.**2**

_____

**2** In view of this disposition, we need not address the NLRB's alternative contention that, within Union Carbide (assuming its continued vitality) acting out of a desire to "remain neutral" in other workers' labor disputes with management, is indeed action "on principle." Though we do not consider it an inflexible rule, we are generally wary of resting decision on alternative procedural default and merits grounds. We believe it appropriate, however, to observe that were the defaulted objection here one of error so manifest that positive injustice would result from failing to consider it, we might well be disposed to excuse the default as, for that reason, one involving "extraordinary circumstances" under § 10(e). It suffices here to say that the Board's "remain-neutral" holding is surely not of that nature. The maintenance of employee neutrality as to other issues in labor disputes has been found in those other contexts to be "protected activity" under§ 7. See NLRB v. Harrison Steel

10

III

We therefore deny PB&S's petition for review and grant enforcement of the Board's order.

SO ORDERED

_____

Castings Co., 728 F.2d 831, 835 n.6 (7th Cir. 1984) (holding that a discharge "designed to coerce employees into taking either a pro-union or anti-union stand" violated the NLRA); Texaco, Inc. v. NLRB, 700 F.2d 1039, 1043 (5th Cir. 1983) (observing that "[t]he NLRA clearly gives workers the right to express an opinion or to remain silent regarding strikes and other valid union activity"). We can reserve for another day when it is properly presented, the "remain-neutral-as-act-of-principle" issue sought belatedly to be raised by PB&S.

11